### THE IRIS.

#### WOODWORTH v. NUTE et al.

(Circuit Court of Appeals, First Circuit. February 2, 1900.)

#### No. 280.

1. MARITIME LIENS—ADMIRALTY JURISDICTION—MARITIME CONTRACTS.

It is settled that contracts to furnish labor or materials for the repair of a vessel, whether made on the credit of the vessel, or the personal credit of the person contracting therefor, are maritime, and within the admiralty jurisdiction.[1]

2. SAME—CREATION BY STATE STATUTES.

It is within the unrestricted power of a state to impose liens on domestic vessels for repairs made or necessaries furnished in the ports of the state; and a suit for the enforcement of such statutory lien may be maintained in a court of admiralty, although no lien would be given under the same circumstances by the general maritime law, as where repairs were made under contract with the owner in the home port, and no agreement for a lien, or mutual understanding that such repairs were furnished on the credit of the vessel, is shown.[2]

3. SAME—REPAIRS OR CONSTRUCTION.

Work done and materials furnished in fitting a steamer, which is then a seagoing vessel, for a different trade from that for which she was originally designed, are to be taken as having been furnished for repairs, and not for construction, although the expenditures therefor are large as compared with the value of the vessel.

4. SAME—REPAIRS UNDER CONTRACT WITH EQUITABLE OWNER—MASSACHUSETTS STATUTE.

Where a vessel is sold, and, after part payment of the purchase price, is delivered to the purchaser under an agreement by which he is authorized to make alterations and repairs at his own expense, the purchaser becomes the equitable owner, and may charge the vessel with liens, under Pub. St. Mass. c. 192, § 14, which gives a lien to one furnishing labor or materials for the repair of a vessel under a contract with the owner.

5. SAME.

It is not essential to the right to a lien under such statute that the repairs should have been made under a mutual understanding between the contracting parties that credit was given to the vessel.

6. ADMIRALTY—EQUITABLE POWERS—RELIEF AGAINST EXCESSIVE STIPULATION.

Where the claimant of a vessel seized in admiralty upon a libel for the enforcement of liens thereon, for which such claimant is not personally liable, to secure its release gives a stipulation without first having the vessel appraised, he may be permitted, on seasonable application, to show

---

[1] As to admiralty jurisdiction as to matters of contract, see note to The Richard Winslow, 18 C. C. A. 347, and, supplementary thereto, note to Boutin v. Rudd, 27 C. C. A. 530.

[2] As to admiralty jurisdiction to enforce liens created by state laws, see note to The Electron, 21 C. C. A. 21.

that such stipulation was given under a misapprehension either as to the nature of the obligation or the value of the vessel; and, if it appears that he is equitably entitled thereto, the court should reduce the amount of the stipulation to the actual value of the vessel.

Appeal from the District Court of the United States for the District of Massachusetts.

For opinion in district court, see 88 Fed. 902.

Frederic Dodge (Gaston, Snow & Saltonstall, on the brief), for appellant.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellees.

Before COLT and PUTNAM. Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. The principles involved in this case have been so obscured by apparently conflicting decisions that they require thorough consideration, even at the cost of a protracted discussion.

The proceedings out of which this appeal arose grew out of alleged liens given by the Public Statutes of Massachusetts (chapter 192, § 14), as follows:

"When, by virtue of a contract, expressed or implied, with the owners of a vessel, or with the agents, contractors, or sub-contractors of such owners, or with any of them, or with a person who has been employed to construct, repair, or launch a vessel or to assist therein, money is due for labor performed, materials used, or labor and materials furnished in the construction, launching, or repairs of, or for constructing the launching ways for, or for provisions, stores, or other articles furnished for or on account of such vessel in this commonwealth, the person to whom such money is due shall have a lien upon the vessel, her tackle, apparel and furniture, to secure the payment of such debt, and such lien shall be preferred to all others on such vessel except that for mariners' wages, and shall continue until the debt is satisfied."

This statute was under consideration in The Glide, 167 U. S. 606, 17 Sup. Ct. 930, 42 L. Ed. 296, and in the cases in the supreme judicial court of Massachusetts out of which The Glide arose, namely, Atlantic Works v. The Glide, 157 Mass. 525, 33 N. E. 163, and 159 Mass. 60, 34 N. E. 258.

When the labor and materials were furnished for which liens are now claimed, the Iris formed a portion of the personal property domestic to Massachusetts, and was within that state; and, unless there is some peculiar reason to the contrary, she was subject to the control of the local legislature. No reason is suggested why it was not within the privilege of that legislature to create liens to arise out of local contracts with the owner of a domestic vessel, or with one who had control by consent of the owner, to the same extent that it might provide liens on buildings to be erected or repaired, or for labor and materials furnished in the reparation of personal property whose locus was in no sense maritime. Nowhere in the decisions of the supreme court with reference to this topic is there any suggestion that it is not in the power of a state, by legislation which is not retroactive, to impose a lien on a domestic vessel under the same conditions and to the same extent as it may impose liens on other property within its jurisdiction.

On the other hand, in several cases, nearly all of which are cited in The Glide, ubi supra, the power of state legislatures in this particular is expressed in unqualified terms. Their general power over personal property domestically situated, with reference to the order of titles and liens, even when the owners are nonresidents, is fully maintained in Green v. Van Buskirk, 5 Wall. 307, 18 L. Ed. 599, and 7 Wall. 139, 19 L. Ed. 109, and in a number of other cases in which the principles of Green v. Van Buskirk have been applied by the supreme court. The rule was especially elaborated and applied in Walworth v. Harris, 129 U. S. 355, 9 Sup. Ct. 340, 32 L. Ed. 712. Accordingly, in The General Smith, 4 Wheat. 438, 443, 4 L. Ed. 609, cited in The Glide, at page 610, 167 U. S., page 931, 17 Sup. Ct., and page 297, 42 L. Ed., it is said, "But, in respect to repairs and necessaries in the port or state to which the ship belongs, the case is governed altogether by the municipal law of that state, and no lien is implied unless it is recognized by that law." So, in The Planter, 7 Pet. 324, 341, 8 L. Ed. 700, cited in The Glide, at page 611, 167 U. S., page 931, 17 Sup. Ct., and page 297, 42 L. Ed., it is stated as follows: "If the service was to be performed in a place within the jurisdiction of the admiralty, and the lien given by the local law of the state of Louisiana, it will bring the case within the jurisdiction of the court" (meaning the district court). So, in The St. Lawrence, 1 Black, 522, 529, 530, 17 L. Ed. 180, cited in The Glide, at page 615, 167 U. S., page 933, 17 Sup. Ct., and page 299, 42 L. Ed., Chief Justice Taney said that in The General Smith "the court held that where, upon the principles of the maritime code, the supplies are presumed to be furnished upon the credit of the vessel, or where a lien is given by the local law, the party is entitled to proceed in rem in the admiralty court to enforce it." So, in The J. E. Rumbell, 148 U. S. 1, 12, 13 Sup. Ct. 498, 37 L. Ed. 345, the same unqualified language is used.

By the maritime law, no lien for supplies or labor furnished a vessel is presumed to arise on a contract made by the owner, and proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created. Neither is it sufficient that the party who furnished the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel, or would not have furnished them except on the belief that he was acquiring a lien for them. In this respect the status is different from what it is with reference to liens for labor and supplies furnished a vessel on the order of her master. This general rule is stated in The St. Jago de Cuba, 9 Wheat. 409, 417, 6 L. Ed. 122; Thomas v. Osborn, 19 How. 22, 29, 40, 43, 15 L. Ed. 534; The Grapeshot, 9 Wall. 129, 136, 137, 19 L. Ed. 651; The Kalorama, 10 Wall. 204, 214, 215, 19 L. Ed. 944; The Emily Souder, 17 Wall. 666, 671, 21 L. Ed. 683; and The Stroma, decided by the circuit court of appeals for the Second circuit, and reported in 3 C. C. A. 530, 53 Fed. 281, 283. It is expressly stated to the same effect in The Valencia, 165 U. S. 264, 270, 271, 17 Sup. Ct. 323, 41 L. Ed. 710.

This distinction has been emphasized with regard to alleged liens for supplies furnished on the order of the charterers of a vessel, especially where there was no apparent necessity for pledging her credit.

The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, ubi supra, at page 271, 165 U. S., page 323, 17 Sup. Ct., and page 710, 41 L. Ed.; and The Samuel Marshall, decided by the circuit court of appeals for the Sixth circuit, reported in 4 C. C. A. 385, 54 Fed. 396, and cited in The Valencia, at pages 271 and 272, 165 U. S., page 323, 17 Sup. Ct., and page 710, 41 L. Ed. In The Philadelphia and The Baltimore, 21 C. C. A. 501, 75 Fed. 684, decided by the circuit court of appeals for the First circuit, where it was maintained that the facts were similar to those in The Kate and The Valencia, the question which arose in those cases was laid aside, because the court found that the supplies were obtained under such circumstances that they were to be held as furnished in a foreign port on the orders of the master; thus bringing the circumstances within The Patapsco, 13 Wall. 329, 20 L. Ed. 696, and within the supposed hypothetical case stated in The Kate, at pages 470 and 471, 164 U. S., page 135, 17 Sup. Ct., and page 512, 41 L. Ed. In respect to this entire subject-matter, there is a distinction recognized throughout between supplies, on the one hand, and seamen's wages and contracts of affreightment, on the other, as to which liens presumptively arise.

This distinction between supplies ordered by the master and those ordered by the owner was given in detail, and practically applied, in The Regulator, 1 Hask. 17, Fed. Cas. No. 11,665; The Advance (decided by the circuit court of appeals for the Second circuit) 19 C. C. A. 194, 72 Fed. 793; The Kalorama, already cited; and The Stroma, already cited.

It is necessary to notice what was said in The Kate, ubi supra, at page 471, 164 U. S., page 140, 17 Sup. Ct., and page 518, 41 L. Ed., to the effect that, though the statute of New York giving a lien was general in its terms, yet, "reasonably construed," it was not to be held to "assume to give a lien where supplies are furnished to a foreign vessel upon the order of the charterer, with knowledge upon the part of the person or corporation furnishing them that the charterer does not represent the owners, but, by contract with them, has undertaken to furnish such supplies at his own cost." The court also at the same place laid aside the question whether, if so interpreted, the statute would not be repugnant to the commerce clause of the constitution. No question of the latter character can arise in this case, because, while the Kate was a foreign vessel at the port where the supplies were furnished her, here the vessel is domestic, and therefore presumably subject to the general rules which we have stated with reference to the power to affect the title of property domestically located, and to give liens thereon.

It is not necessary to state in detail the undisputed facts of the case, because they are mainly given in the opinion of the learned judge of the district court. It is sufficient to say that the person holding the legal title to the vessel, who is now the claimant, had given an agreement for her sale for $7,000, of which $3,000 had been paid, and the corporation agreeing to purchase obligated itself to pay the balance. The agreement also provided that the purchasing party might make alterations and repairs "at the expense" of that party. The repairs permitted were of such a character as to imply that the

purchasing party should take possession of the vessel, which it did; and all the supplies and labor in issue were obtained on contracts made by it, and the claimant was no party thereto, and in no way personally liable on them.

It is claimed that the labor and supplies were for construction, and not for repairs. It is true that the expenditures were large, compared with the value of the vessel, and that she was, through them, readapted for a trade for which she had not been originally designed. Nevertheless, with reference to the questions which arise in this case, they were not analogous to work done in the construction of a new vessel, nor even to the reconstruction of one which, through wreck or age, had become unsuitable to navigate the seas. At the time the labor and supplies were furnished, she was a seagoing steamer; and, although her repairs were made under the supervision of a United States inspector of steam vessels, they were only such as were found necessary to adapt her for her new route. Therefore the labor and supplies are to be taken as furnished for repairs, and not for construction, as those expressions are understood in the various decisions of the federal courts.

One Bartlett had general charge of the work in behalf of the purchaser of the vessel, and it seems to have been assumed by the libelants that he stood in the position of the master of the Iris. So far as any question in this case is concerned, this is not a just assumption. It is true, he had been a master mariner; but he had never been licensed as master of a steam vessel, and he could not have been put in command of the Iris. He was merely an agent superintending her repairs. It is necessary to have this fact distinctly in mind, in order that it may clearly appear that the relations of the parties and the vessel to the repairs were not affected by the peculiar presumptions which arise from the ordering of necessary supplies by the master of a vessel, acting technically as such, and that the rules which we have stated about those not ordered by the master apply to this case.

It is urged on the court that no lien attaches in this case because the contract was not made with the claimant, who had the legal title, nor with any person in privity with him, but with the agreed purchaser. It is maintained that this brings the case within The Kate, ubi supra, and The Valencia, ubi supra,—especially within the expression which we have cited from The Kate, at page 471, 164 U. S., page 140, 17 Sup. Ct., and page 518, 41 L. Ed., that the statute of New York giving a lien, "reasonably construed, does not assume to give a lien where supplies are furnished to a foreign vessel upon the order of the charterer, with knowledge upon the part of the person or corporation furnishing them that the charterer does not represent the owners, but by contract with them has undertaken to furnish such supplies at his own cost." This raises the first principal question in the case. The second principal question is raised by the claim that as the supplies were furnished in the home port, and not by the order of the master, there is no evidence in the record that liens were created by mutual understanding, within the force of the rule which we have explained; and there is a further important proposi-

tion,—that, unless the case shows that credit was given the vessel, no lien can arise which can be enforced in admiralty, although the circumstances fulfill all the conditions which the local statute requires.

As to the first of these questions, there is no analogy between the case at bar and The Kate, ubi supra, or The Valencia, ubi supra, where the supplies were ordered by a charterer. In the case at bar, notwithstanding the form of the agreement for the purchase of the vessel, the agreed purchaser had been put in possession, and therefore was, on equitable principles, her owner; and the seller merely had a lien on her to secure the balance of the purchase money. On the well-settled rules recognized by the equity courts, which rules have full force in admiralty, as universally admitted, and as especially stated by Mr. Justice Story in The Virgin, 8 Pet. 538, 550, 8 L. Ed. 1036, the transaction established the equitable relation of mortgagor and mortgagee; and this to such an extent that there can be no question that if the vessel had been sold, and the proceeds brought into the registry of the court in admiralty, the agreed purchaser would have been entitled to them after payment of the amount due the seller. As the Massachusetts statute under consideration is akin to the admiralty law, it must be presumed to have regard to its equitable rules. The claimant in this case stated precisely the law governing courts proceeding in this particular on equitable rules, when he said, according to his own testimony:

"I have nothing to do with the repairs. I have sold the boat to Mr. Brighty's company. * * * My sole interest in the boat now is to get the balance of my money, and see that you don't injure her by what you do to her."

In this particular the claimant stands substantially as the mortgagee stood in The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, 37 L. Ed. 345, where similar liens under a state statute were held to have priority over a mortgage, although there was nothing in the record to show that the mortgagee was any party to the contracts for supplying the vessel, or even had any knowledge of them, and although his mortgage had priority in date over the supplies. It never has been understood in admiralty that persons dealing with the equitable owner of a vessel are required to secure the assent of mortgagees or other lienors, and the law is indisputably held to the contrary. In all such cases it follows from the relations of the parties that the repairs put on a vessel are done "at the expense" of the equitable owner; so that in this respect these words, when used in the contract for the sale of this vessel, added nothing to what the law implied, and in no way affected the relations that would have existed if they had not been expressed. The charterer of a vessel, who has no interest in her hull except for a temporary use under the charter, cannot be said to be procuring supplies at his own charge if he procures them under such circumstances as would impose a lien on what is the property of the person who lets the vessel; while the mortgagor or an agreed purchaser in possession, whether he obtains supplies on his personal credit or on the credit of the vessel, of which he is the equitable owner, and which he has obligated himself to purchase, obtains them at his own expense as much in the case at bar as in The J. E. Rumbell.

There is much ground for holding that the claimant was indiffer-- ent whether or not the purchaser should charge the vessel with liens. This might be inferred from his conversations, but none of them were with any person claiming a lien, so that the claimant was not estopped by them. It perhaps might well be said that the claimant, having carefully stated his relations to the vessel in a contract, was not bound to disregard his other engagements, and follow out rumors or statements brought to him in incidental conversations. It seems, also, to have been held in Bates v. Emery, 134 Mass. 186, that a contractor does not come within the statute unless he contracted with the owner or with somebody who represented him, and that the words "with a person who has been employed," which occur in the statute, are to be limited accordingly. Therefore, unless the agreed purchaser is held to have been the equitable owner, an additional difficulty would arise from the fact that the contracts in this case were not made with the claimant, or with any person who represented him. There is some ground for finding from the facts in the record that the claimant held out the agreed purchaser as the owner of the vessel, and that therefore he is estopped from denying that liens might arise from contracts made by the latter. But this is met by the terms of the contract of sale, which expressly permitted the purchaser to make the repairs, yet did not employ him to do so, and there is not enough to justify the inference that the claimant altered his position from that in which the contract left him. Therefore, on the whole, we can safely rest our determination of this question only on the broad ground which we have stated, to the effect that the contracts for supplies and labor were made by the equitable owner of the vessel.

With reference to the second of the three questions which we have stated, which is as to the effect of the proposition that the proofs do not show that credit was given the vessel by the mutual understanding of the parties to the transactions, that understanding may, of course, be inferred from facts as well as from express language, as is ordinarily true with reference to all alleged contracts where it must be shown that the minds met. While the record raises a reasonably strong presumption that the parties who furnished the supplies and labor supposed that they were obtaining liens on the vessel, it does not come up to showing that the agreed purchaser, which ordered the repairs, contemplated, in any respect, the question of liens, or had any understanding in reference thereto. The most it shows is that Capt. Bartlett understood that the contractors had liens, but, so far as the agreed purchaser is concerned, the record is a blank in this particular. We are therefore to look at the terms of the statute, which contain no requirement beyond that the supplies and labor be furnished to a domestic vessel on the order of the owner, or of somebody representing him or employed by him. In this respect it is treated in Jones v. Keen, 115 Mass. 170, 183, as in the same group with the ordinary statutes giving liens on buildings, as to which it is clear that no evidence is required that either of the parties contemplated credit to the property. Of course, with reference to all property domestically located, whether buildings or vessels, circumstances may be such (for exam-

ple, when the supplies are furnished on a general account) as to show that the parties intended that credit should be given solely to the purchaser; but we can see nothing in the language of the statute in question at bar, or in the reasons for it, which would require a different interpretation from that given to ordinary statutes establishing liens. Such is the result of The Kiersage, 2 Curt. 421, Fed. Cas. No. 7,762, if it be accepted as law. Certainly such must be held to be the practical determination of the learned judge (Mr. Justice Curtis) who decided that case. There materials were furnished two vessels under construction on joint orders for both vessels, but a lien was allowed on each vessel for the part of the materials used for her benefit. In that case it was as impossible to hold that a lien arose from any fact, except that the materials were supplied and used, as to say that any credit was given to either vessel for any specific part of the materials furnished. So far as the case supported a lien for materials used in the construction of a vessel, it is superseded by later decisions; but it stands as yet unimpaired as the practical judgment of the learned judge who decided it, as applied to the particular question which we are considering.

In The Glide, 167 U. S. 606, 17 Sup. Ct. 930, 42 L. Ed. 296, already referred to, the lien created by the Massachusetts statute was held to be maritime, and within the exclusive jurisdiction of the admiralty courts. The petition in the superior court of Massachusetts, out of which The Glide arose, was in the following form:

"The petition of the Atlantic Works respectfully shows that it is a corporation duly established under the laws of the commonwealth of Massachusetts, and having its usual place of business at said Boston, in said commonwealth, and that Alfred E. Cox, of Malden, Middlesex county, and said commonwealth, is its treasurer; that by virtue of a contract with Jonathan Chase, of said Boston, the said the Atlantic Works did at various times between July 20, 1887, and February 1, 1891, perform and furnish labor and furnish and use materials in the repairs of a certain steam vessel called 'The Glide,' said Glide being a tugboat owned by said Jonathan Chase, together with John Morrison, Henry R. Lawler, Helena H. Chase, and Mark A. Kearns, all of said Boston, so far as known to the petitioner; that said Glide belongs to the port of Boston, at which port she was when labor and materials were furnished, performed, and used as aforesaid; that the amount due for said labor and material, after deducting all just credits, is thirteen hundred ninety-five $^{64}/_{100}$ dollars, according to the account hereto annexed, and interest from February 1, 1891, when, or about when, demand of payment was made; that said labor consisted of machine, boiler, smith, pattern, drafting, and coppersmith labor, and use of tools; that said materials comprised castings, forgings, and other metals; that the petitioner, pursuant to Public Statutes of Massachusetts (chapter 192), and conformably to the provisions thereof, duly filed a sworn statement in the office of the clerk of the city of Boston aforesaid. Wherefore the petitioner prays that said vessel may be sold, and the proceeds of the sale applied to the discharge of the demand as hereinbefore set forth.

                              "The Atlantic Works,
                                  "Alfred E. Cox, Treas'r."

There is nothing in this petition alleging that the supplies were furnished on the credit of the vessel, by any mutual agreement, expressed or implied. It does not appear that this particular proposition was brought to the attention of the court; but the full petition was before the supreme court, and The J. E. Rumbell, 148 U. S.

1, 13 Sup. Ct. 498, 37 L. Ed. 345, already cited, is specific on this point. The substance of the petitions for the lienors is given at pages 2 and 3, 148 U. S., page 498, 13 Sup. Ct., and page 345, 37 L. Ed., and is as barren of any facts, except merely that of furnishing the supplies, as was the petition in The Glide. The statute of Illinois giving the liens is abstracted at pages 13, 14, and 15, 148 U. S., page 498, 13 Sup. Ct., and page 345, 37 L. Ed., and is as barren in this particular as the statute in issue here. The point was expressly taken by the counsel, at page 4, 148 U. S., page 498, 13 Sup. Ct., and page 345, 37 L. Ed., that there was no allegation or proof that the supplies were furnished on the credit of the vessel; and yet the liens were established by the supreme court as within the admiralty jurisdiction, and as displacing a mortgage, as we have already said. We think we are, therefore, safe in holding, in the absence of evidence that the case is exceptional in the particulars we have suggested, that there is no necessity, under the local statute, of either alleging or proving that credit was given the vessel by mutual agreement, and that the case in behalf of the appellees is free from difficulty in this respect.

There remains the third principal point which we have stated,— that, in the absence of proof that credit was given the vessel, no admiralty lien can arise, although the circumstances fulfill all the conditions which the local statute requires. This is supported by two supposed authorities. In The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396, 402, there is a dictum, in effect, that a local lien can be enforced in admiralty only where credit is given the vessel, and that in this respect there is the same limitation as with reference to supplies furnished a ship in a foreign port. The Lottawanna, 21 Wall. 559, 22 L. Ed. 654, is supposed to lay down a similar rule at page 581, 21 Wall., and page 654, 22 L. Ed.; but this question did not arise in that case, and at page 580, 21 Wall., and page 663, 22 L. Ed., the opinion says, "The rights of material men furnishing necessaries to a vessel in her home port may be regulated in each state by state legislation." Also, in The Glide, at page 620, 167 U. S., page 930, 17 Sup. Ct., and page 296, 42 L. Ed., ubi supra, the opinion quotes from The Lottawanna the unqualified language which we have already cited. In truth, this third point is but a repetition, in a new form, of the last question which we have answered, and seems to be disposed of by what we have said about The Glide and The J. E. Rumbell; and we have shown, by a full citation of authorities in the early part of this opinion, that the supreme court has reiterated the unrestricted power of state legislatures to create liens on domestic vessels under such limitations as each may determine.

We can therefore see no reason, in principle or on the authorities, why, as the statute of Massachusetts assumes to give a lien, that lien should not be enforced in the admiralty courts, independently of any question whether or not, by its terms or by its fair construction, there is needed any understanding that credit be given the vessel. It is settled beyond all doubt that the contracts themselves, so far as they were personal to the parties, or if the supplies had been furnished exclusively on the credit of the parties, were mari-

time and within the admiralty jurisdiction, as those expressions are understood in the federal courts; and this has been so held from the earliest to the latest decisions of the supreme court touching this topic. The General Smith, 4 Wheat. 438, 443, 4 L. Ed. 609; The Planter, 7 Pet. 324, 341, 8 L. Ed. 700; The St. Lawrence, 1 Black, 522, 529, 17 L. Ed. 180; The Lottawanna, 21 Wall. 558, 580, 22 L. Ed. 654. To the same effect are various clear expressions contained in the opinions of Mr. Justice Gray, in behalf of the court, in The J. E. Rumbell, 148 U. S. 1, 19, 13 Sup. Ct. 498, 37 L. Ed. 345, and in The Glide, 167 U. S. 606, 610, 611, 613, and 624, 17 Sup. Ct. 930, 42 L. Ed. 296. The decision in Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90, which held that a marine insurance policy is a maritime contract, and within the jurisdiction of the admiralty courts of the United States, threw off all fetters, and left all questions of this class to be determined on general and harmonious principles. The contracts in this case for materials and labor being maritime in their nature, and the state having, under the authorities which we have explained, a full right to create liens, the case in admiralty becomes complete if only the conditions of the statute which assumes to give the liens are complied with, and whether or not those conditions conform in all details to the general rules of the maritime law. It is our opinion, therefore, that, in any view of the undoubted facts of the case, the district court was right in sustaining the claims of the libelants to be satisfied out of the vessel.

Another question remains to be considered. As we have already said, there is no suggestion that the claimant of the vessel was in any way personally liable for the materials and labor involved in this litigation, or that he had ever become responsible for them, except through his efforts to protect the vessel against them. He put in his claim to the vessel in the district court on the 18th day of March, 1898. The same day he gave an admiralty stipulation for $13,000, in the usual form, including a condition for the payment of the final decree. This stipulation seems to have been hastily given. It does not show that it was approved by the proctors for the libelants, but it is to be presumed that it would not have been accepted by the court, and followed by a delivery of the vessel to the claimant, unless the court was in some way advised that the stipulation was satisfactory to them. The more cautious proceeding would have been in accordance with admiralty rule 11; that is to say, an appraisal of the vessel, followed by a stipulation for the amount thus ascertained. It must, however, be accepted as unquestioned that the stipulation given took the place of that provided by the rule.

The appellant filed two assignments of error, to the effect that the court denied him the benefit of the statutes limiting the liability of owners of vessels, as claimed in an amendment to his answer, and also to the effect that the court erred in holding that the stipulation for $13,000 was a determination of the value of the vessel, binding the claimants. The amendment referred to was filed May 14, 1898, and it alleged that the amount of the claims was in excess of the value of the vessel at the time of the filing of the libels. This is followed by a prayer for a limitation of liability, and also a prayer

that the court will order the actual value of the steamer determined, and that no decree be entered exceeding that value.

We are not referred to any proofs in the record showing any facts to which this amendment could have any relation, but the learned judge of the district court said as follows:

"The claimant has filed a petition to have his stipulation canceled upon the ground that it is for a larger amount than the true value of the steamer. As the claimant entered into the stipulation deliberately, and without objection to its amount, his error in valuation is not a sufficient reason for cancellation."

It is self-evident that no statute limiting the liability of the owners of vessels has any relation to this case, because—First, there was no original liability resting on the claimant; and, second, a stipulation in admiralty represents the amount of the owner's liability after he has received the full benefit of the statutes limiting it. On the other hand, notwithstanding there are no proofs in the record that the $13,000 stipulation was in excess of the value of the vessel at the time she was stipulated for, it is apparent that the ruling cited shut out evidence of that character, while we think the district court ought to have given consideration to the effect of the question whether or not the stipulation was for an excessive amount.

The pith of the ruling of the court below was to shut out proofs of mistakes in valuation because the stipulation was voluntarily executed, and without waiting for an appraisal of the vessel. In admiralty there is no hard and fast rule of this nature with reference to correcting mistakes of a substantial character. In cases like this at bar, where, so far as can be perceived, no person could suffer injustice by correcting the alleged mistake, if there were one, admiralty will apply equitable principles with even less regard to any rigid rules in reference thereto than the chancery courts. If the court below had opened up the facts, one of two things might have appeared which would have entitled the claimant to relief; that is to say, either that he had misapprehended the effect of the stipulation, and had assumed it to be like an ordinary obligation at the common law, where the ultimate payment would be only the amount equitably due, whatever the nominal penalty of the obligation, or that he made a substantial error in the value of the vessel; so that, in either event, unless he is relieved, the libelants may recover substantially larger sums than they are justly entitled to as against stipulators.

In The Virgin, 8 Pet. 538, 550, 8 L. Ed. 1036, already referred to, the court, it is true, observed, at page 552, 8 Pet., and page 1036, 8 L. Ed., that the stipulator was not at liberty to insist that the ship was of less value in his hands than the appraisal. No special equities, however, were brought to the attention of the court; but, where there are equities, there is every reason why an admiralty court should use, on enlarged principles, the discretion uniformly availed of even by common-law courts to reduce bail demanded before it is taken, or excessive bail after it is taken, or to relieve against excessive attachments after they are made. There is no practical or equitable reason why that discretionary power should not be extended to cases of this class. When the equities are clear, the power

of the admiralty court to apply them is so manifest that authorities need hardly be cited on this proposition; but in The Duchess de Brabant, Swab. 264, 266, Dr. Lushington said:

"And there have been many cases cited at the bar where, bail having been given for a larger amount than the value of the property, the amount has been reduced."

So, in The Staffordshire, L. R. 4 P. C. 194, 211, Lord Justice Mellish, speaking in behalf of the judicial committee, said that:

"After bail has been given, on a proper case being made out, the court of admiralty will go into the question whether the res which was seized—the whole of the property which was attached—was of more or less value than the amount for which bail was given; and, if it is found that it was of less value, then the parties will only be obliged to pay the amount of it."

This, of course, is not a universal rule, which would justify stipulators in every case in applying for relief, because, if the claimant has seen fit to give a stipulation without availing himself of the benefit of admiralty rule 11, and without having a proper appraisal under that rule, he is presumably guilty of laches; and he is not in a position to ask for the exercise of equitable powers unless he shows clearly misapprehension, and that justice will be done himself, and no injustice done the libelants, by a reduction of the stipulation to such an amount as he can establish would have been the maximum which he ought to have given if he had proceeded under the rule.

In order that the district court may inquire whether or not the stipulation in this case should be reduced, and, if yes, to what extent, its decree is reversed, and the case is remanded to that court for further proceedings according to our opinion passed down this day; and each party will pay one-half of the costs of appeal.