## THE O. H. VESSELS.

#### (Circuit Court of Appeals, Third Circuit. November 29, 1910.)

#### No. 1,401.

1. MARITIME LIENS (§ 11*)—"REPAIRS"—"CONSTRUCTION"—WHAT CONSTITUTE.
  Inclosing the deck of a barge to protect her cargo from the weather to fit her for a particular business constitutes repairs, and not construction.
  [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 15; Dec. Dig. § 11.*
  For other definitions, see Words and Phrases, vol. 2, pp. 1465-1468; vol. 7, pp. 6096-6101; vol. 8, p. 7785.]

2. MARITIME LIENS (§ 28*)—REPAIRS.
  Repairs made on a vessel in a foreign port under a contract with a charterer, but confirmed by the master and with the knowledge of the managing owner, entitle the repairer to a lien, although the charter party contained a provision, not known to him and of which he was not notified, that they should be made at the expense of the charterers.
  [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 46, 47; Dec. Dig. § 28.*]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Suit in admiralty by John Kramer and Lewis Kramer, copartners as John Kramer & Sons, against the steam barge O. H. Vessels. Decree (177 Fed. 589) for libelants, and respondent appeals. Affirmed.

Willard M. Harris, for appellant.

Henry R. Edmunds, for appellees.

Before BUFFINGTON and LANNING, Circuit Judges, and CROSS, District Judge.

CROSS, District Judge. A libel was filed in admiralty by John Kramer & Sons against the steam barge O. H. Vessels, registered at the port of Wilmington, Del., to recover the sum of $426.53 for carpenter work done on the vessel and materials furnished therefor at Philadelphia in March, 1909. The vessel had previously been engaged in carrying coal, hay, and other materials of that character, at which time her sides were open to the weather, and, as it was desired to put her in a condition to carry perishable freight, it became necessary that her deck should be inclosed. The libelants, who were house carpenters, performed the work and furnished the necessary materials. Luther R. Vessels, the managing owner of the steam barge, on Febru-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

183 F.—36

ary 19, 1909, entered into a charter party with H. J. Shock and Frank W. Litchfield, in which, among other things, it was stipulated as follows:

"That said steam barge shall be delivered by the party of the first part at his own expense at such wharf in Philadelphia or Camden, as may be designated by the parties of the second part, within five days after the signing of this charter party, for the purpose of having such improvements made at their own expense as will enable said steam barge to properly carry perishable freight. That said improvements shall become part of said steam barge without any allowance therefor to the parties of the second part at the conclusion of this charter party."

We think that the work done upon the barge by the libelants may fairly be termed repairs, and not construction. No alterations were made which essentially changed the character of the barge. After their completion she remained a freight boat, but one better adapted to carry freight requiring protection from the weather. The Iris, 100 Fed. 104, 40 C. C. A. 301 and The Ella (D. C.) 84 Fed. 471, support our conclusion that the work in question was in the nature of repairs rather than of construction. Indeed, the contrary was not strongly urged at the argument. Coming to the merits of the controversy, it should be remarked that, if the clause of the charter party above quoted was known by the libelants before they entered upon the work in question, they were bound thereby, and the vessel cannot be held liable therefor, unless, indeed, there was a contract to that effect between the libelants and the managing owner. Whether the libelants had knowledge of the charter party, and, if they had, whether there was a contract between them and the managing owner that the vessel should be bound for the repairs, are disputed points in the case. The testimony is conflicting, and cannot be reconciled. It appears that the contract as originally made was between Litchfield, one of the charterers, and the libelants. At least a letter was written by libelants under date of March 1, 1909, to Litchfield, in which they proposed to do certain of the work in question for the sum of $253. Extra work was subsequently performed increasing the charge to $426.53. Litchfield was the captain of the boat when the repairs were made. One Kelly was its master, and Luther R. Vessels, its managing owner, acted as engineer. Prior to the date of the above letter, John Kramer, one of the libelants, upon request visited the O. H. Vessels while she was lying at a wharf in Philadelphia, and while there was introduced to Litchfield, who he supposed was master of the barge. Litchfield pointed out the work he desired done, which Kramer agreed to do for $258, and which apparently was the same work that was referred to in the above-mentioned letter. Litchfield thereupon called Capt. Kelly and introduced him to Kramer as master of the vessel, and at the same time said to him, "whatever this man (Kelly) wants you to do, go ahead and do it." Subsequently, but at the same interview, Kramer swears that Kelly said: "Everything is all right, everything is safe, and for all the work that is done on the barge the boat is responsible for." Kelly, the master of the barge, while denying this conversation, admits that he took charge of the repairs, and that, using his language, "there was nothing about the labor on the boat

that I did not order. There could not have been anything done without my knowledge." Vessels, the managing owner, in his verified answer denies that either he or the master of the barge ordered any repairs to be done to the barge, while according to the master's testimony, as just shown, Kelly ordered everything done that was done. Furthermore, Vessels himself upon cross-examination admits that Capt. Kelly gave orders concerning at least two or three of the items of repairs. Kelly's testimony and Vessels' admissions are corroborated by several other witnesses to an extent that permits of no doubt that the allegations of the answer above referred to are untrue, thereby measurably impairing the credibility of Vessels' testimony. Again, Kramer swears that Vessels said to him that he knew the boat was liable for the work which he did upon her. In this connection Kramer also swears that Vessels told him to try and get the money from Litchfield, but that, if he did not pay, he, Vessels, knew that the boat was liable, and that he would hold it at the wharf until they got the money, which was due them. Kramer furthermore denies that Vessels ever told him that the boat was chartered, and would not be liable for the repairs. Eissler, one of the libelants' witnesses, swears that he heard Vessels say to Kramer, "You can hold the boat if you don't get paid," and from the evidence of Capt. Kelly it may fairly be inferred that, even he did not know that the vessel was chartered, while Kramer positively denies that he knew anything about the charter party. Vessels swears, however, and he is corroborated in this by his nephew, Clarence W. Vessels, and one James C. Moffitt, a deckman, that he told Kramer that the vessel was chartered and would not be liable for the repairs. Both of the corroborating witnesses were careful to say, however, and to say repeatedly, as did Vessels, that this conversation took place about 8 or 9 o'clock in the morning of the day that the lumber for the repairs was brought on the vessel. The foregoing conversation is positively denied by Kramer, who, in turn, is indirectly corroborated by two witnesses who swear, as does Kramer, that he was not on the vessel the morning when the lumber was taken on the barge, and the corroborating witnesses further testify that because of that fact, and after search had been made for Kramer, both on the boat and wharf, the lumber was receipted for by Eissler, a carpenter, and a receipt therefor signed by him was offered in evidence and marked as an exhibit in the case. The other witness who testifies that Kramer was not present when the lumber was delivered was the man who delivered it at the boat. The case is a close one, but we find as a fact, after careful consideration of all the evidence, that the libelants had no knowledge of the existence of the charter party, much less of its terms, and, furthermore, as Judge McPherson well says, the master of the boat in effect became a party to the original contract, and the managing owner of the boat, being on board and having full knowledge of everything that was done, allowed the repairmen to believe that they would have a lien for the cost of their work. Indeed, it is not going too far to say that there appears throughout the case an understanding between the managing owner and master and the libelants that the boat should be liable for the repairs.

Our conclusion is in accord with that of the learned judge of the District Court, and the decree of that court is accordingly affirmed, with costs.